UNITED STATES DISTRICT COURT
NORTHERN DISTRICT NEW YORK

---

**CITY OF SYRACUSE POLICE OFFICER JOHN BAGGETT, CITY OF SYRACUSE POLICE OFFICER RICKEY WILLIAMS, and CITY OF SYRACUSE POLICE OFFICER ESTEBAN TROTMAN,**

**Plaintiffs,**

***-against-***

Civil Action No.: 5:12-CV-337 (LEK/TWD)

**CITY OF SYRACUSE, CITY OF SYRACUSE POLICE DEPARTMENT, MAYOR STEPHANIE MINER, POLICE CHIEF FRANK FOWLER in his official capacity, CITY OF SYRACUSE POLICE OFFICER JEFF PIEDMONTE, in his official and individual capacity as President of the Syracuse Police Department PBA, SYRACUSE POLICE DEPARTMENT POLICE BENEVOLENT SOCIETY, and CITY OF SYRACUSE POLICE OFFICER JUDY CULETON, in her official and individual capacity, jointly and severally,**

**Defendants.**

---

# VERIFIED COMPLAINT

---

**PLAINTIFFS**, CITY OF SYRACUSE POLICE OFFICER JOHN BAGGETT, CITY OF SYRACUSE POLICE OFFICER RICKEY WILLIAMS, and CITY OF SYRACUSE POLICE OFFICER ESTEBAN TROTMAN, by and through their attorney of record, ***Mark David Blum, Esq.***, do hereby complain and allege as follows

## PARTIES

1. Plaintiff John Baggett is an adult African American resident of the County of Onondaga, State of New York and at all times relevant, was in the employ as a full time police officer at the City of Syracuse Police Department.

2.    Plaintiff Rickey Williams is an adult African American resident of the County of Onondaga, State of New York and at all times relevant, was in the employ as a full time police officer at the City of Syracuse Police Department.

3.    Plaintiff Esteban Trotman is an adult African American resident of the County of Onondaga, State of New York and at all times relevant, was in the employ as a full time police officer at the City of Syracuse Police Department.

4.    That all the Plaintiffs herein were members of and participants in an assembly of African American police officers within the City of Syracuse Police Department known as 'Camp 415'.

5.    Defendant City of Syracuse is a duly incorporated municipality of the State of New York and maintains and has operational control over the City of Syracuse Police Department.

6.    Defendant City of Syracuse was at all times relevant an employer as defined by 42 USC §2000e(b).

7.    Defendant Stephanie Miner is the Mayor of the City of Syracuse and in that capacity is responsible for the overall operation and administration of the City of Syracuse and the departments therein, including the City Police Department.

8.    Defendant Frank Fowler is the Chief of the City of Syracuse Police Department and is ultimately responsible for decisions involving, among others, the hiring, promotion, discipline, operations, allocation of resources, and control of personnel within the City of Syracuse Police Department.

9.    Defendant Jeff Piedmonte is a Caucasian police officer at the City of Syracuse Police Department who, upon information and belief, is a resident of the County of Onondaga,

and who at all times relevant was acting in the scope of his employment as President and presiding officer of the City of Syracuse Police Department's Police Benevolent Association (hereinafter 'the PBA' or 'the union').

10. Defendant Judy Culeton is a Caucasian police officer at the City of Syracuse Police Department who, upon information and belief, is a resident of the County of Onondaga, and who at all times relevant was acting within the scope of her employment as Commander and supervisor of Human Resources at the City of Syracuse Police Department.

**JURISICTION**

11. This Court has jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1341, 28 U.S.C. §1343, 28 U.S.C. §1343(4), 28 U.S.C. §1441, 28 U.S.C. §1443, 42 U.S.C. §1981, 42 U.S.C. §1983, 42 U.S.C. §1988, 42 U.S.C. §2000e-5(f), as well as the Freedom of Assembly provision of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

12. This action properly lies in the courts of the United States District Court of the Northern District New York pursuant to 28 U.S.C. §1391(b) because the claims arose in the district.

13. Plaintiff John Baggett timely filed a complaint with the New York State Division of Human Rights alleging the defendant City of Syracuse Police Department and the 'PBA' discriminate against African American employees in the Department.

14. On or about November 29, 2011, Plaintiff John Baggett received a Right to Sue letter issued by the EEOC.

## FACTS COMMON TO ALL CAUSES OF ACTION

15. The City of Syracuse and its Police Department have a long and detailed history of hostility toward, among others, African Americans serving in the ranks.

16. The situation had gotten to the point that in 1978 an action was brought by the City of Syracuse to prevent the City from being forced to integrate its department via civil service exams (***Alexander v. Bahou***, NDNY 78-cv-392) which action was later joined with an action by the (***United States of America v. City of Syracuse***, NDNY 80-cv-53) wherein the City of Syracuse entered into a Consent Decree intended on resolving and easing the racial disparities in the City of Syracuse Fire and Police Departments. (See exhibit 1).

17. The parties to the above referenced Consent Decree specifically agreed to work toward the goal that, "the long term goal for blacks in each rank" is approximately 10%. (*see*, at page 12, ¶6).

18. Currently, thirty three years after execution of the aforesaid Consent Decree, the percentage of Black officers at each rank at the City of Syracuse Police Department from the rank of Sergeant up through lieutenant, captain and deputy chief – all civil service positions – is ZERO percent (0%).

19. Pursuant to the same Consent Decree, page 13, the City of Syracuse was to reach a hiring goal of 25% Black police officer recruits. For the years 1994 through 2009 (years for which data is available), the City of Syracuse Police Department has hired new officers in the following proportions:

| Year | Number Graduated | Number of Black Officers |
|---|---|---|
| 1994 | 27 | 0 |
| 1994 | 30 | 2 |
| 1997 | 20 | 2 |
| 1997 | 12 | 0 |
| 1998 | 12 | 0 |

| | | |
|---|---|---|
| 1998 | 12 | 1 |
| 1999 | 29 | 2 |
| 2000 | 17 | 1 |
| 2004 | 16 | 3 |
| 2005 | 24 | 2 |
| 2006 | 29 | 1 |
| 2007 | 20 | 1 |
| 2009 | 24 | 2 |
| 2009 | 25 | 0 |

20.     When the City of Syracuse Police Department determines it needs to fill vacancies at any rank, a civil service examination is scheduled.  The first and most important list is the list for candidates for the rank of Sergeant.  There is no other way to move up ranks without first being appointed sergeant.

21.     Upon information and belief, at the discretion of the City of Syracuse Police Department, that list can be extended out for a period of years, a new test can be scheduled to generate a new list, or a list can expire without having a replacement generated.

22.     In the past 25 years, only four Black police officers were promoted to sergeant.  One officer scored first on the test and was still passed over for promotion.  When that officer took the test again and again scored first, the officer was promoted to sergeant but never was promoted beyond the rank of sergeant.  Of the four who did make sergeant in the past 25 years, 2 went on from the rank of sergeant to deputy chief and finally Chief of Police.  The other two Black officers never were promoted beyond the rank of sergeant until they retired.

23.     It has been the history of the Syracuse Police Department that whenever Black officers are high enough on the list that their likelihood of promotion to sergeant is imminent, the Department either cancels the list ordering a new test or delays hiring at all.  When there are no Black officers high enough on the list where they are likely to be hired, the Department his historically extended the time frames for the existing list or cancels a scheduled test for a new

list.  There have been times in recent past where the current list has been held in place and used for promotions for as long as five years if not more.

24.     Upon reliable information and belief, the decision whether to keep the list, schedule a new test, or have no list is made and enforced by the defendant Judy Culeton.

25.     So long as there is no list in place or no new test scheduled, officers cannot advance up the promotions ladder.

26.     Plaintiff Rickey Williams took a test in 2007 and was high enough on the list that there were only five people ahead of him for promotion to sergeant.  (He was #16 and eleven officers were hired).    The Department personnel office decided that five more sergeants were needed and instead of hiring down the list which would have resulted in Plaintiff Williams getting the promotion, in June of 2009, less that three years prior to commencement of this action, the Department held a new test for a new list to be effective in November of 2009. Plaintiff Williams did not score in the top five on that list.  When the list did come out, five Caucasian officers were immediately promoted therefrom to the rank of sergeant.  Had the previous list been utilized, Plaintiff Williams should have been among those promoted.

27.     The 2009 list did not have any Black officers anywhere within reach of being promoted.  That list was scheduled to be retired in 2011 and a new test administered.  Instead, the 2009 list remains in place today and the new test was cancelled by defendant Judy Culeton.

28.     Plaintiff Williams is not the only officer to face such a situation where when it was his turn to be promoted off the list, a new test is suddenly scheduled and a new list ordered. It is a pattern and practice at the Department that has been going on for more than a decade and several officers have suffered fate similar to Plaintiff Williams.

29. The State of New York came up with a policy regarding civil service examinations to assist minority performance in scoring. It is called a "band" score. Rather than receive a specific number score for test performance, a test taker would get a banded score, or a letter grade type score which would reflect a range of numbers instead of a specific number score. It was the intent of this type of scoring to help raise up those scoring lower and putting them together in groupings.

30. The civil service examination is given by Onondaga County but upon information and belief, the administration, scoring, determinations of scoring methods, and other specifics regarding the test and its' results are designed, organized, supervised, and managed by the Syracuse Police Department.

31. At some point prior to the 2009 test, the Syracuse Police Department decided to halt the use of band scoring and returned to the numerical scoring. Doing so resulted in Black officers scoring lower on the promotions list and not having the opportunity for promotion.

32. Plaintiff Esteban Trotman, also an African American police officer and member of Camp 415 likewise took the 2007 above mentioned sergeant's examination. But for the removal of band scoring, Plaintiff Trotman would have scored high enough on the test to be considered for promotion.

33. The total number of African Americans on the 2007-2009 list was 3 and would have been 4 had band scoring been continued.

34. Had the defendant City of Syracuse honored its agreement in the hereinabove mentioned and attached exhibit Consent Decree, those Black officers who took the 2007 examination should have been hired to start the process of moving toward the stated goal of ten percent of all ranks filled by Black officers.

35.    Over the years, the City of Syracuse Police Department has taken a hostile attitude toward Black officers.  Black officers who complained about abusive race based treatment were themselves subjected to harsh discipline, unfavorable transfers, harassment on the job, loss of overtime, and other job related sanctions.

36.    The culture within the Syracuse Police Department was so hostile toward Black officers that these officers lived in fear of losing their jobs and their pensions and resulted in Black officers keeping their mouths shut when they witness or were subjected to wrongdoing, refusing to even take the civil service promotions test because they knew they wouldn't be hired, and not taking action when they were victimized out of fear of retaliation.

37.    The defendant Jeff Piedmonte is President and the controlling officer who single handedly makes decisions for the Syracuse Police Department's PBA.  As president of the Union, defendant Piedmonte would not assist Black officers in problems they were experiencing.  Defendant Piedmonte and others would work together to either ignore race based issues brought to their attention or would work against the interests of the Black officers to remedy the issue.

38.    The situation with the Department and the PBA got so bad that it reached a point that Black officers formed a group called Camp 415 where these officers could meet and speak with a united voice on issues that involved them within the Department.  The defendant Frank Fowler was among the founders of Camp 415.

39.    One such incident happened in January 7, 2005 when Plaintiff John Baggett filed a 10-1 regarding an incident involving a superior Caucasian officer.  Based on denials by the offending supervisor, Plaintiff Baggett filed a second 10-1.  One week later, Plaintiff Baggett was suspended based on false allegations by the offending supervising officer.  Dates and

language on official police reports were changed with white out to make the situation appear even worse.

40.     In response to the suspension, Plaintiff Baggett filed a grievance.  The PBA and specifically defendant Piedmonte ignored the grievance and behaved arbitrarily and with discrimination such that the grievance was not heard by the arbitrator until 2010; more than five years after the grievance was filed.   Two of the charges against Plaintiff Baggett were overturned by the arbitrator but the PBA make no efforts to return the lost pay and benefits to Plaintiff Baggett until 2011.

41.     The Syracuse Police Department, the PBA and defendant Piedmonte respond completely differently when Caucasian officers are sanctioned by superiors.  Officers who harm the public are not subjected to disciplinary action, have union grievances promptly acted upon and resolved, and still get promoted.

42.     To the contrary, Black recruits have their wives interrogated about race attitudes. Black officers are subjected to harsh punishment for minimal actions and certainly disproportionately so when compared with Caucasian counterparts, have their complaints ignored and not acted upon by the PBA, are required to return to work despite having serious physical injuries, (one Black officer was made to return to work and had to drag her IV pole around with her), and are constantly subjected to racial slurs and stereotypes ("all the minorities in Syracuse are drug dealers").


//

//

//

43.    For example:

a)  Black police officer fired after 14 years on the job for allegedly patronizing a prostitute.  White police officer caught exposing himself several times and trades oral sex for not arresting a suspect was made to sign a "promise not to do it again" and is transferred until retirement.  White officer found to be trading drugs for sex with prostitutes while on the job is not fired but allowed to resign keeping his retirement and benefits.

b)  Black police officer accused of endangering the welfare of a child and given no PBA representation or assistance.   White officer charged with rape (statutory rape) and officer was defended vigorously by the PBA.

c)  White officer stops a female driver who smells of alcohol and driver is given a choice of a breathalyzer or giving the officer a blowjob and when she opts for the latter to avoid a charge and later complains to the department, officer allowed to resign (and thus keep his pension and benefits and is now working for a nearby police department).

d)  Black police officers injured on the job forced to return to work, forced to see Department doctors who clear them for work despite risk of further injury; one of whom was made to work with his arm in sling but were not allowed to carry their weapons.  White officers minimally injured on the job allowed to take extensive medical leave and early medical retirements.

e)  Caucasian officer commits perjury during trial testimony and is allowed to resign keeping his retirement and benefits.

f)  Black officer falsely accused of beating a suspect suspended and it takes more than five years to clear him of the false charge because PBA wouldn't assist.  Caucasian officer

beats a handcuffed suspect in an interrogation room suffers no disciplinary action and is given an award by the PBA.

44. As recently as January 11, 2012, Caucasian supervisors would direct parking checkers to put parking tickets on Plaintiff Baggett's vehicle.

## AS AND FOR A FIRST CAUSE OF ACTION

## 42 USC §1983

45. Plaintiffs restate and reassert all those allegations set forth hereinabove at paragraphs 1-44 inclusive as if same were set forth here anew.

46. The actions of the Defendants referenced above in failing to comply with the terms of the Consent Decree and manipulation of the Civil Service Examination for promotions caused a race based discriminatory impact upon African American police officers and as such violated Plaintiff Williams' rights and the rights of others similarly situated to the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

47. The actions of the City of Syracuse Police Department in halting its use of band scoring assured that African American police officers would be less likely to score high enough to pass and be hired off the sergeant's civil service examination.

48. That the actions by the defendant Culeton were intentional and she knew or should have known that her actions were having a discriminatory disparate impact upon African American police officers seeking promotions.

49.     That the failure to comply with the Consent Decree and manipulation of the Civil Service Examination for promotions and which caused a race based discriminatory impact upon African American police officers was an intentional act.

50.     That the failure to comply with the Consent Decree and manipulation of the Civil Service Examination for promotions and which caused a race based discriminatory impact upon African American police officers was malicious and intended to prevent the advancement of African American police officers within the department.

51.     That as a direct and proximate result of the failure to comply with the Consent Decree and manipulation of the Civil Service Examination for promotions and which caused a race based discriminatory impact upon African American police officers, Plaintiffs Williams and Trotman and others similarly situated lost past and future pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits.

52.     As a further result of the municipal defendant's actions, Plaintiffs have suffered and continue to suffer emotional distress, mental anguish, and humiliation along with other incidental and consequential damages and expenses.

53.     That the actions by the defendant Culeton alone and in conspiracy with others not herein named were egregious, willful, and malicious such that Plaintiffs Williams and Trotman demand that punitive damages be assessed against the defendant Culeton in an amount sufficient to make the point that such behavior is tolerated in civil society.

54.     That because after the passage of 33 years since the City pledged it would do something about the racial disparity at the Syracuse Police Department, that the Court appoint a Special Master or Panel to oversee the hiring, promotion, and discipline of Black officers within the Syracuse Police Department.  (*See* Consent Decree, at page 10, sub paragraph (c)).

55. A jury trial is demanded on this cause of action.

**AS AND FOR A SECOND CAUSE OF ACTION**

**42 USC §1981, 42 USC §1983**

56. Plaintiffs restate and reassert all those allegations set forth hereinabove at paragraphs 1-55 inclusive as if same were set forth here anew.

57. The actions of the Defendants referenced above created a hostile work environment so pervasive with racial animus and discriminatory treatment that it caused a breach in the benefits, privileges, terms, and conditions of the employment of Plaintiff Baggett and others similarly situated in violation of the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

58. That the actions of the Defendants referenced above created a hostile work environment so pervasive with racial animus and discriminatory treatment that doing so was well known throughout the institution called the City of Syracuse Police Department and that such racial animus was open and tolerated was malicious and intended to harm the reputations and careers of African American police officers within the department.

59. That as a direct and proximate result of hostile work environment so pervasive with racial animus and discriminatory treatment that doing so was well known throughout the institution called the City of Syracuse Police Department and that such racial animus was open and tolerated was malicious and intended to harm the reputations and careers of African American police officers within the department, Plaintiff Baggett and others similarly situated lost past and future pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits.

60.     As a further result of the municipal defendant's actions, Plaintiffs have suffered and continue to suffer emotional distress, mental anguish, and humiliation along with other incidental and consequential damages and expenses.

61.     A jury trial is demanded on this cause of action.

## AS AND FOR A THIRD CAUSE OF ACTION

### Title VII, 42 USC §1983

62.     Plaintiffs restate and reassert all those allegations set forth hereinabove at paragraphs 1-61 inclusive as if same were set forth here anew.

63.     That the hereinabove described acts of the defendants violate 42 USC §2000e, Title VII based on their race.

64.     That such racial animus was open and tolerated was malicious and intended to harm the reputations and careers of African American police officers within the department, Plaintiffs and others similarly situated lost past and future pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits.

65.     As a further result of the municipal defendant's actions, Plaintiffs have suffered and continue to suffer emotional distress, mental anguish, and humiliation along with other incidental and consequential damages and expenses.

66.     Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs hereinabove alleged and this action is the only means by which they can obtain any relief for their injuries.

67.     A jury trial is requested on this cause of action.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**As against JEFF PIEDMONTE and the SYRACUSE PBA**

68. Plaintiffs restate and reassert all those allegations set forth hereinabove at paragraphs 1-67 inclusive as if same were set forth here anew.

69. A union has a duty to fairly represent its members in grievances against an employer.

70. This duty includes an "obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

71. The Syracuse Police Department and Jeff Piedmonte personally did breach their duty toward Black officers by engaging in behavior that was and continues to be arbitrary, discriminatory, and in bad faith. African American police officers are simply not treated with the same respect, zeal, representation, or defense as are Caucasian officers.

72. That the breach of duty by the PBA and Jeff Piedmonte did harm the reputations and careers of African American police officers within the department, Plaintiffs and others similarly situated lost past and future pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits.

73. As a further result of the identified defendants' actions, Plaintiffs have suffered and continue to suffer emotional distress, mental anguish, and humiliation along with other incidental and consequential damages and expenses.

74. That, in addition, because of the egregious, wanton and callous actions of the defendant Piedmonte, his grave indifference to the rights of the Plaintiffs and his duty thereto, and his willful abuse of his office as President of the PBA to deny Plaintiffs their rightful and

paid for union protection and fair duty of representation, Plaintiffs also demand punitive damages be assessed against Jeff Piedmonte, in an amount sufficient to make the point.

75. Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs hereinabove alleged and this action is the only means by which they can obtain any relief for their injuries.

76. A jury trial is requested on this cause of action.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**42 USC §1983**

77. Plaintiffs restate and reassert all those allegations set forth hereinabove at paragraphs 1-76 inclusive as if same were set forth here anew.

78. That the actions taken against Plaintiff members of Camp 415 by the defendants because of their participation and membership in Camp 415 were in violation of the fundamental rights of Plaintiffs and other similarly situated under the First Amendment and Fourteenth Amendment constitutional right of assembly.

79. That the disparate treatment of Camp 415 members by the municipal and union defendants in violation of their First Amendment rights did cause Plaintiffs and others similarly situated to suffer harm to their reputations and careers as well as lost past and future pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits.

80. As a further result of the identified defendants' actions, Plaintiffs have suffered and continue to suffer emotional distress, mental anguish, and humiliation along with other incidental and consequential damages and expenses.

81. Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs hereinabove alleged and this action is the only means by which they can obtain any relief for their injuries.

82. A jury trial is requested on this cause of action.

***WHEREFORE***, in light of the forgoing, Plaintiffs respectfully seek from this Court an Order entered against the Defendants, directing as follows:

1. Compensation in full for back and front pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits lost as a result of the disparate impact the promotion system has had upon the Plaintiff Rickey Williams and others similarly situated.

2. Compensation in full for back and front pay, opportunity for subsequent promotions, seniority, bonuses, deferred compensation, and other employment benefits lost as a result of the racially hostile work environment has had upon the Plaintiffs and others similarly situated.

3. Compensation for any emotional distress, mental anguish, humiliation, and other incidental and consequential damages and expenses.

4. Punitive damages against Judy Culeton in an amount to significant to send a message that such behavior will not be tolerated in civil society.

5. Punitive damages against Jeff Piedmonte in an amount to significant to send a message that such behavior will not be tolerated in civil society.

6. The appointment of a Special Master or Panel to oversee the hiring, promotion, and discipline of Black officers within the Syracuse Police Department.

7. Attorneys fees where applicable and appropriate

8. Costs of this Action.

9. Jury Trial on all causes of action

10. Such further and other relief as to this Court is just and proper.

Respectfully submitted
This 24th Day of February 2012

***Law Offices of Mark David Blum***

________/s __________________

**Mark David Blum, Esq.**
Bar roll #505862
Attorney for John Baggett, Rickey Williams, and Esteban Trotman
Office & P.O. Box
P.O. Box 82
Manlius New York 13104
Telephone: (315) 420-9989
Email: mdb@markblum.com

# VERIFICATION

STATE OF NEW YORK )
COUNTY OF ONONDAGA ) ss:

JOHN BAGGETT being duly sworn, deposes and says that he is the Plaintiff in the within action, that he has read the foregoing COMPLAINT and knows the contents thereof and he acknowledges that he executed the same and that same is true and correct to the best of HIS knowledge except as to those matters stated as being upon information and belief.

DATED: 23 FEB 12

JOHN BAGGETT

Sworn to before me this
23rd Day of February 2012

NOTARY PUBLIC

LORI A. WHEELER
Notary Public, State of New York
Qualified in Madison County
Reg. No. 01WH6223251
Commission Expires June 7, 2014

# VERIFICATION

STATE OF NEW YORK )
COUNTY OF ONONDAGA ) ss:

ESTEBAN TROTMAN being duly sworn, deposes and says that he is the Plaintiff in the within action, that he has read the foregoing COMPLAINT and knows the contents thereof and he acknowledges that he executed the same and that same is true and correct to the best of HIS knowledge except as to those matters stated as being upon information and belief.

DATED: 2-23-12

ESTEBAN TROTMAN

Sworn to before me this
23rd Day of February 2012

NOTARY PUBLIC

LORI A. WHEELER
Notary Public, State of New York
Qualified in Madison County
Reg. No. 01WH6223251
Commission Expires June 7, 2014

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF ONONDAGA ) ss:

RIC WILLIAMS being duly sworn, deposes and says that he is the Plaintiff in the within action, that he has read the foregoing COMPLAINT and knows the contents thereof and he acknowledges that he executed the same and that same is true and correct to the best of HIS knowledge except as to those matters stated as being upon information and belief.

DATED:

RIC WILLIAMS
Ricky Williams

Sworn to before me this
23 Day of February 2012

NOTARY PUBLIC

**ROBIN R HAMILTON**
**Notary Public - State of New York**
**No. 01HA6244152**
**Qualified in Onondaga County**
**My Commission Expires July 05, 2015**